498 A.2d 833

COMMONWEALTH of Pennsylvania, Appellee,

v.

Charles Preston HOLCOMB, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 10, 1984.

Decided Oct. 4, 1985.

Reargument Denied Jan. 8, 1986.

428

430

432

John P. Dohanich, Public Defender's Office, Beaver, for appellant.

Edward J. Tocci, Dist. Atty., John Lee Brown, Jr., Asst. Dist. Atty., Beaver, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT
## OF THE COURT

HUTCHINSON, Justice.

This is a direct appeal from a death penalty imposed by Beaver County Common Pleas on a conviction for first-degree murder.[1] Additional sentences of imprisonment for convictions of rape,[2] kidnapping,[3] theft[4] and indecent assault[5] arising out of the same occurrence are also before us. The jury returned the death penalty for the first-degree murder conviction after the separate sentencing hearing required by our capital punishment act. 42 Pa.C.S. § 9711(a).

Appellant raises expressly on this appeal:

(1) Whether his *Miranda* rights were violated during questioning;

(2) Whether the arrest was supported by either probable cause or a valid arrest warrant;

(3) Whether the trial court abused its discretion by not granting the motion for change of venue;

(4) Whether certain photographic evidence was improperly admitted;

(5) Whether the evidence as a whole was insufficient to support the convictions;

(6) Whether the trial court's charge on kidnapping was proper;

(7) Whether the Pennsylvania death penalty provisions violated the United States and Pennsylvania Constitutions; and

(8) Whether the evidence supported the imposition of the death penalty in this case.

1. 18 Pa.C.S. § 2502.
2. 18 Pa.C.S. § 3121.
3. 18 Pa.C.S. § 2901.
4. 18 Pa.C.S. § 3921.
5. 18 Pa.C.S. § 3126.

After a careful review of all of the issues presented, our additional independent review of the record [6] and a further proportionality review as required by the death penalty statute, 42 Pa.C.S. § 9711(h)(3)(iii), we affirm the convictions and the sentence imposed. We will address each of these issues in the order presented.

## I.

This prosecution arises out of the killing of Sandra Jean Vespaziani in Beaver County on Saturday, January 16, 1982. Mrs. Vespaziani and a friend were on their way home from their jobs in the Beaver Valley Mall. Her friend stopped at an adjacent store, while Mrs. Vespaziani remained in the car. When her companion came out of the store, both the car and Mrs. Vespaziani were missing.

Mrs. Vespaziani's body was found the next day, a half mile from the car in which she had been waiting, and about 12 to 16 miles away from the shopping mall. The interior of the car was burned. Medical tests showed that the victim had been raped.

On Monday, January 18, 1982, the police received information that the appellant had appeared between 8:00 and 8:30 P.M. on Saturday at a house, the Tice residence, about

6. Our scope of review in this case is quite broad and goes beyond the normal constraints of an adversary system. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *reh'g. denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In each case we must determine whether the death sentence was the "product of passion, prejudice or any other arbitrary factor" as required by 42 Pa.C.S. § 9711(h)(3)(i). *Id.,* 500 Pa. at 26–27 n. 3, 454 A.2d at 942 n. 3. In that case we said:

[W]e will not adhere strictly to our normal rules of waiver. The primary reason for this limited relaxation of waiver rules is that, due to the final and irrevocable nature of the death penalty, the appellant will have no opportunity for post-conviction relief where he could raise, say, an assertion of ineffectiveness of counsel for failure to preserve an issue or some other reason that might qualify as an extraordinary circumstance for failure to raise an issue. 19 P.S. § 1180–4(2). Accordingly, significant issues perceived *sua sponte* by this Court, or raised by the parties, will be addressed and, if possible from the record, resolved.

*Id.,* 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19.

one mile from where the body had been found. By sheer happenstance one of the persons at this house knew and recognized appellant. Learning of the victim's discovery from the public media and hearing the police request for help from anyone with relevant knowledge, the witnesses from the farmhouse came forward to identify appellant. They stated that the appellant had come to the house on foot suffering from the elements on one of the coldest nights of the year, with temperatures around –18° F. and a wind chill factor of –50° F. One of these witnesses also testified that appellant asked if there were any scratches or blood on him. After a time in the house, appellant was driven to a convenience store some miles beyond the mall at which Mrs. Vespaziani had last been seen alive. From that store appellant called a relative who drove him back to the mall to pick up his car.

Based on this information, the police chief sent some officers out to look for appellant. When they found him, they asked him to come to the police station. He did so freely, even though the police had not told him why they wanted to talk to him. At the station, appellant was interviewed from 4:30 to 8:30 p.m. on Monday, January 16. The police asked if he knew why they wanted to speak with him. Appellant said that he thought the questioning concerned his whereabouts on Sunday, when he was involved in a fight at a bar. The police stated they were really interested in where he was on Saturday. At that time, appellant said that he was in a bar all day, from 11:00 a.m. to 11:00 p.m. The police told him there were reports that he had been seen elsewhere. At that point, they read him his *Miranda* rights. He signed a waiver form, and was then told exactly what they were investigating.

Appellant remained in the police station, undergoing questioning. He gave several different versions of where he had been on Saturday. During the questioning, appellant suggested that the police take a picture of him to show around the bars he had been. The police did this while appellant remained at the station. No one verified any of

appellant's stories. During the interview, appellant also suggested the police search his mother's car for a jacket they were seeking. His mother consented to the search, and police found a penknife and most of a case of beer. These items were not taken until the police had obtained a search warrant. The testimony at trial indicated that none of the people named by appellant could vouch for his actions during the crucial hours between about 6:00 p.m. until about 10:00 p.m. Saturday evening.

During questioning, appellant was told at several times that he was free to go. He nevertheless stayed and answered more questions. He was unguarded while the police left from time to time during the interview to check his story. When he left the station after the interview he had not yet been placed under arrest.

An arrest warrant was issued for appellant on Wednesday, January 20, 1982. When the police could not find him, they told his mother about the warrant and asked that he contact them immediately. Later that afternoon, appellant called the police and gave himself up.

In a jury trial June 15–22, 1982, appellant was found guilty of first-degree murder, rape, kidnapping, indecent assault, and theft by unlawful taking. A separate sentencing hearing was conducted on the murder conviction, as required by 42 Pa.C.S. § 9711(a)(1). The jury, after hearing evidence on aggravating and mitigating circumstances, imposed the death penalty. This direct appeal followed.

## II.

Appellant claims that his *Miranda* rights were violated when he was initially questioned by the police. He argues that he should have received *Miranda* warnings because he was the focus of the investigation when the police asked him to come in for questioning. *See Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), explained by *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Appellant nevertheless asks this Court to continue to follow *Escobedo* and suppress all statements

made in the police station, including his suggestions to show the photographs and to search his mother's car.

The "focus of the investigation" test comes from *Escobedo, supra.* *Escobedo* held that the police must inform the defendant of his rights when "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect." *Id.* 378 U.S. at 490, 84 S.Ct. at 1765. Subsequently, in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court determined that the defendant needed a warning regarding his rights during "custodial interrogation." The *Miranda* Court stated that this was what was meant by "focus" in *Escobedo.* 384 U.S. at 444, n. 4, 86 S.Ct. at 1612, n. 4.

Some two years later, this Court, in *Commonwealth v. Feldman,* 432 Pa. 428, 248 A.2d 1 (1968), set forth its interpretation of a defendant's rights under *Miranda* and *Escobedo:*

> From reading *Escobedo* and *Miranda* together it becomes clear that whenever an individual is questioned while in custody *or* while the object of an investigation of which he is the focus, before *any* questioning begins the individual must be given the warnings established in *Miranda.*

*Id.,* 432 Pa. at 432, 248 A.2d at 3 (emphasis in original). This language has been cited as the conclusively established statement of a defendant's rights under *Miranda.* *See, e.g., Commonwealth v. O'Shea,* 456 Pa. 288, 318 A.2d 713, *cert. denied,* 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974); *Commonwealth v. D'Nicuola,* 448 Pa. 54, 292 A.2d 333 (1972).

In 1976, the United States Supreme Court clarified its definition of "custodial interrogation" in *Beckwith, supra.* *Beckwith* held that *Miranda* only protects the defendant during actual custodial interrogation, rejecting Beckwith's claim that the government should have informed him of his rights while he was the focus of a criminal tax investigation. The *Beckwith* Court stated that *"Miranda* was grounded squarely in that Court's explicit and detailed

438

assessment of the peculiar 'nature and setting of ... in-custody interrogation.' " 425 U.S. at 346, 96 S.Ct. at 1616. The *Beckwith* decision thus effectively repudiated the inference that the *Escobedo* focus test was still necessary under the federal constitution.

This change in federal constitutional requirements was not, however, followed by an immediate change in this Court's interpretation of the *Miranda* line of cases. The first reassessment of *Feldman* was in *Commonwealth v. McLaughlin*, 475 Pa. 97, 379 A.2d 1056 (1977):

> Although by our placing of "object of an investigation" in the disjunctive with the custodial requirement, it might appear as though the Pennsylvania interpretation of when *Miranda* warnings are required was broader than the United States Supreme Court's interpretation, an examination of the facts taken with the language of Pennsylvania cases indicates those cases may be interpreted as being harmonious with *Beckwith*.

*Id.*, 475 Pa. at 101–02, 379 A.2d at 1058. *McLaughlin* noted further that in each case where the court had found that the defendant had been the "focus" of an investigation, he had been sufficiently deprived of liberty to invoke the *Miranda* protections. *Feldman* and *McLaughlin* thus show this Court's resolve to fully conform to all federal constitutional requirements, but not to extend greater protection to defendants under Pennsylvania Constitution Art. I, § 9.

Later cases from this Court did not clearly reflect the *McLaughlin* view that the focus test could not stand on its own. *Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980), merely cited *Commonwealth v. O'Shea, supra,* for its statement of the *Feldman* test. We analyzed the relevant facts using both prongs of the *Feldman* test ("In the instant case, appellant was neither in custody nor the focus of the investigation." 488 Pa. at 235, 412 A.2d at 484). In *Commonwealth v. Meyer*, 488 Pa. 297, 412 A.2d 517 (1980), we expressly refused to rule on whether the "focus" test was still valid, although we did cite the quoted

language from *McLaughlin, supra,* at 438. The *Meyer* opinion thus left open the possibility that an independent focus test should be applied despite *McLaughlin.* That impression may have been strengthened by *Commonwealth v. Horner,* 497 Pa. 565, 442 A.2d 682 (1982), which, like *Patterson,* merely cited *O'Shea* in a footnote and analyzed the facts using both the focus and the custodial interrogation test. ("In light of these facts, the trial court was correct in concluding that appellant was neither in custody nor the focus of any investigation at the time...." *Horner,* 497 Pa. at 575, 442 A.2d at 687).

Not long after *McLaughlin,* Superior Court set forth its understanding of this area of the law in *Commonwealth v. Anderson,* 253 Pa.Superior Ct. 334, 385 A.2d 365 (1978). In *Anderson,* widely cited with approval by subsequent panels of the Superior Court in analyzing *Miranda,*[7] that court concluded that *McLaughlin* had overruled the independent focus test saying:

"[Therein], the Supreme Court ... decided that the status of primary focus of an investigation alone did not require the administration of *Miranda* warnings...."

*Id.,* 253 Pa.Superior Ct. at 346, 385 A.2d at 371. The *Anderson* Court did, however, retain the focus test as an aid in determining whether a suspect was in custody for *Miranda* purposes.

■ Since *McLaughlin,* we have not had occasion to concisely summarize our case law on this subject. With the issue now squarely before us we conclude that the interpretation of *McLaughlin* Superior Court set out in *Anderson* is correct. When *Commonwealth v. Feldman, supra,* first described the use of the focus test in this Commonwealth, it

7. *See Commonwealth v. Palm,* 315 Pa.Superior Ct. 377, 386–87, 462 A.2d 243, 248 (1983); *Commonwealth v. Nunez,* 312 Pa.Superior Ct. 584, 589, 459 A.2d 376, 378 (1983); *Commonwealth v. Schoellhammer,* 308 Pa.Superior Ct. 360, 365–66, 454 A.2d 576, 579 (1982); *In re Miller,* 294 Pa.Superior Ct. 322, 326, 439 A.2d 1222, 1224 (1982); *Commonwealth v. Michael,* 288 Pa.Superior Ct. 151, 153, 431 A.2d 333, 334 (1981); *Commonwealth v. Brodo,* 262 Pa.Superior Ct. 375, 378, 396 A.2d 802, 804 (1979).

did so only to fully comply with the federal constitutional requirements *Miranda* imposed. In *Feldman* we sought to provide the same protections in our state system. We did not intend to afford defendants a greater degree of protection under the Pennsylvania Constitution. *Feldman's* reading of *Miranda* and *Escobedo* seemed entirely proper at the time. *Beckwith* teaches us that the *Feldman* version of *Miranda* is no longer required. We do not believe our own Constitution should be more broadly interpreted. Thus, we now state that *Miranda* warnings are necessary only when a suspect is undergoing actual custodial interrogation, with the issue of the focus of the investigation only a relevant factor in determining custody.

The appellant here has conceded that when he was brought to the police station he was not "in custody" under the standards of *Miranda*.[8] The facts bear this out. He went to the station voluntarily, he cooperated with the police, and was told several times that he was free to leave. This fact situation is very similar to that in *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In that case, defendant "came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a half hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.' " 429 U.S. at 495, 97 S.Ct. at 714. In the instant case as in *Mathiason, Miranda* warnings were not necessary.[9]

8. This Court has held that a person is in custody when
 he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. *Commonwealth v. Chacko*, 500 Pa. 571, 573, 459 A.2d 311, 314 (1983) (citations omitted).

9. Because the evidence shows that appellant was not in custody, counsel was no ineffective for conceding this point. *See Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967).

■ This appellant was not subjected to the "custodial interrogation" which requires *Miranda* warnings, although the police gave him those warnings when his answers contradicted other information they had independently obtained. These warnings seemed to have been given to protect against the focus test. However, appellant was not then placed under arrest. He was still free to leave at any time. Therefore, under our reasoning no warnings were necessary and any argument that appellant's waiver of the *Miranda* rights was not voluntary and intelligent need not be addressed. Since *Miranda* warnings were not required, the evidence acquired during this questioning was properly admitted.

### III.

■ Appellant further argues that his arrest was invalid because the warrant was not accompanied by the required statement of probable cause. *See* Pa.R.Crim.P. 119. We need not address the validity of the warrant, however, since the facts known to the police were sufficient to justify a warrantless arrest. *Commonwealth v. Irving,* 485 Pa. 596, 403 A.2d 549 (1979), *cert. denied,* 444 U.S. 1020, 100 S.Ct. 676, 62 L.Ed.2d 651 (1980) (arrest made pursuant to defective warrant is proper if supported by sufficient, independent probable cause).[10]

■ A warrantless arrest on a felony is legal if the police have probable cause to believe that the person arrested actually committed the felony. *Commonwealth v. Lovette,* 498 Pa. 665, 450 A.2d 975 (1982), *cert. denied,* 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983). This Court has defined probable cause as:

**10.** Although appellant ultimately gave himself up to the police, he knew that an arrest warrant had been issued. Because the surrender was compelled at least in part by the defective warrant we must analyze it as we would any other warrantless arrest. *See Commonwealth v. Bosurgi,* 411 Pa. 56, 68 n. 10, 190 A.2d 304, 311, n. 10, *cert. denied,* 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963) (submission to arrest cannot form basis for probable cause).

facts and circumstances known to the police or about which they have reasonably trustworthy information at the time of the arrest ... sufficient to warrant a person of reasonable caution in believing the suspect has committed or is committing a crime.

*Commonwealth v. Bartlett,* 486 Pa. 396, 400, 406 A.2d 340, 341 (1979). The record establishes that such probable cause existed in this case. Appellant had been seen in the immediate area of the abduction at about the time it occurred. Shortly after the estimated time of death, he was in the area where the body was found. His concern whether there were scratches or blood on him indicated that he had recently been in some struggle. In addition, by the time of his arrest, he had already given inconsistent statements to the police about his activities at the time the crime took place. Based on these facts, the warrantless arrest was proper.

## IV.

Appellant asks this Court to remand his case to the trial court because it refused to grant a motion for change of venue.[11] While the record does contain evidence suggesting that a change of venue could have been properly ordered, it does not show that the trial court abused its discretion in refusing to do so. The applicable standards for granting a change of venue are well established:

[A]n application for a change of venue is addressed to the sound discretion of the trial court, and its exercise of discretion will not be disturbed by an appellate court in the absence of an abuse of discretion.... "In reviewing the trial court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial

11. Pa.R.Crim.P. 312(a) provides:
All motions for change of venue ... shall be made to the court in which the case is currently pending. Venue ... may be changed by that court when it is determined after hearing that a fair and impartial trial cannot otherwise be had in the county where the case is currently pending.

publicity." ... Normally, one who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the empaneling of the jury.... But this rule is subject to an important exception. In certain cases there "can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice," ... because the circumstances make it apparent that there is a substantial likelihood that a fair trial cannot be had.

*Commonwealth v. Romeri,* 504 Pa. 124, 131–32, 470 A.2d 498, 501–02 (1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984) (quoting *Commonwealth v. Casper,* 481 Pa. 143, 150–51, 392 A.2d 287, 291 [1978]). *See also Commonwealth v. Frazier,* 471 Pa. 121, 369 A.2d 1224 (1977); *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209, *cert. denied,* 414 U.S. 478, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973).

*Romeri* goes on to state that even where there is prejudicial publicity, a fair trial may sometimes still be had in that community. We listed several factors relevant to this issue:

whether the pre-trial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of sensational, inflammatory and "slanted articles demanding conviction" ...; whether the pre-trial publicity revealed the existence of the accused's prior criminal record; whether it referred to confessions, admissions or reenactments of the crime by the defendant; and whether such information is the product of reports by the police and prosecutorial officers.

*Commonwealth v. Romeri,* 504 Pa. at 132, 470 A.2d at 502 (quoting *Commonwealth v. Casper,* 481 Pa. at 152–53, 392 A.2d at 292) (footnotes and citations omitted).

This case was originally highly publicized in its vicinity by local as well as Pittsburgh media. There were many articles in the Beaver County Times, the Pittsburgh Post-Gazette and the Pittsburgh Press. The three major Pittsburgh television stations covered the crime itself on local news broadcasts. Beaver County and Pittsburgh radio stations reported news of it regularly. While this coverage was extensive, we cannot say that it was "so sustained, so pervasive, so inflammatory, and so inculpatory" as to require a venue change. The *voir dire* in this case took three days, generating 600 pages of transcripts. Those veniremen who showed that they had already formed a fixed opinion about guilt or innocence were excluded for cause. The jurors and alternates ultimately selected were found satisfactory by both prosecution and defense counsel. Therefore, no claim of actual prejudice can be sustained here.

The most serious problem with the media coverage of this case is the mention of appellant's prior conviction for rape. Numerous articles in all papers set forth appellant's prior record as a rapist. It was mentioned in all three newspapers the day after appellant was arrested. The Pittsburgh papers stated it in their headlines. It was referred to in the nightly news broadcasts of two of the three area television stations; and, in addition, it was mentioned repeatedly by several radio stations.[12] While the information given was generally factual and objective, the media did reveal the existence of a prior criminal record which would be inherently prejudicial to the appellant, if not dissipated by time.

However, even publicity which is inherently prejudicial will not require a change of venue if the effect of that publicity was sufficiently dissipated before the time of the trial to allow a defendant to receive a fair trial. In *Romeri*, we stated that "[t]he critical factor in the finding of presumptive prejudice ... is the *recent* and *pervasive presence* of 'inherently prejudicial' publicity." 504 Pa. at 134, 470

---

**12.** The defense introduced evidence from only two radio stations in Beaver County and one radio station in Pittsburgh.

A.2d at 503 (emphasis added) (quoting *Commonwealth v. Casper, supra,* 481 Pa. at 154, 392 A.2d at 293).

In *Romeri* we tested for pervasiveness by looking at the number of prospective jurors who had formed a fixed opinion regarding the guilt or innocence of the defendant. While that is one indicator, it is not the only one. We are concerned not only with those who have prejudged a case from its media coverage but also with those who have heard or seen prejudicial information, which would taint the judgment process of those ultimately selected to hear the case. Those who say beforehand that they have formed a fixed opinion will be dismissed for cause. The problem comes with those who say they can set aside their prior knowledge. While not discrediting everyone who makes this statement, it cannot be denied that the information, once heard, might be recalled at some later point and then have some effect. Knowledge of prior unrelated criminal conduct, unrecollected at *voir dire,* may thus put the defendant in an unfair position. The task of resolving that issue is one peculiarly appropriate for the discretion of a trial judge who knows his community and can observe the potential jurors' interaction with counsel and the court during *voir dire.*

In this case, only 14 of the 63 veniremen not excused for personal reasons had formed a fixed opinion. All of them were dismissed for cause. An overwhelming majority, 60 of those 63, had either read the newspaper articles or heard the television and radio newscasts that mentioned appellant's criminal record. While all members were asked if they remembered any facts about the appellant, only one person specifically recalled the existence of the prior criminal record. Still, the fact that such a large number of the panel heard the prejudicial publicity may render it pervasive under *Romeri* and *Casper* and, if so, unless its effect were dissipated, venue would have had to be changed.

■ Thus, the critical issue in this case is dissipation of the initial prejudicial effect. The lapse of time between publication of the prejudicial information and trial has been

found relevant in many cases. Here, there was a "cooling-off" period. Little if any information was broadcast between January (when appellant was arrested) and June (when the jury was empaneled). There was some publicity immediately preceding the trial when the appellant moved for a change of venue. However, it was not in the "pervasive" category of the earlier series. None of the later articles in the Beaver County Times mentioned the prior convictions, and only two articles in the Pittsburgh Post-Gazette mentioned them, one while the *voir dire* was conducted. On these facts, we cannot say the June publicity was so sustained or pervasive as to require a change of venue. Neither can we find an abuse of discretion on the part of the trial judge. To do so would ignore the effect of the cooling-off period, and substitute our own judgment for that of the lower court. Therefore, on this record, we affirm the order denying the motion for change of venue as one within the trial court's discretion.

## V.

■ Appellant also argues that the trial court erred by admitting two pictures of the victim's body as it was found at the scene of the murder. That ruling, too, is reviewed only for abuse of discretion. *Commonwealth v. McCutchen*, 499 Pa. 597, 454 A.2d 547 (1982); *Commonwealth v. Hudson*, 489 Pa. 620, 414 A.2d 1381 (1980). The pictures were of the body as it was found lying in the snow, with much of the clothing ripped off and with the genitalia exposed. The appellant claims the photographs should not have been admitted because such evidence was inflammatory and the information gleaned from the pictures was available from police testimony.

This Court has adopted a two-part test for determining whether to admit potentially inflammatory photographs:

> To determine whether such photographs are admissible, we have utilized a two-tiered analysis. The trial judge must initially decide whether the photographs possess inflammatory characteristics. If they do not, the photo-

graphs are admissible as are any evidentiary items, subject to the qualification of relevance.... If the photographs are deemed inflammatory, then the trial judge must decide whether the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of their inflaming the passions of the jurors.

*Commonwealth v. Hudson,* 489 Pa. at 630, 414 A.2d at 1386 (1980). The photographs in this case, however, are not inflammatory and are therefore properly admissible. The pictures were taken from a distance and were in black and white. Little, if any, blood is seen in them. In addition, they show the amount of force the killer used, which is relevant to the proof of both rape and homicide. *See McCutchen, supra.* The trial judge did not err by admitting the photographs.

## VI.

### A.

Appellant asserts that the Commonwealth's evidence is insufficient to prove that he was guilty of any of the crimes charged. He argues first that evidence did not suffice to prove all the elements of first-degree murder beyond a reasonable doubt. After examining the evidence on this record, taking from it, as we must, all inferences favorable to the Commonwealth as verdict winner and resolving all conflicting evidence in its favor, this argument fails. *Commonwealth v. Pronkoskie,* 498 Pa. 245, 445 A.2d 1203 (1982); *Commonwealth v. Kichline, supra.* Appellant points out that the evidence presented by the prosecution is circumstantial and that there is no direct testimony or scientific evidence showing him at the scene of the crime. However, the cumulative effect of all the circumstantial evidence together with the reasonable inferences and conclusions logically flowing from that evidence is enough to support the guilty verdict.

We have long held that circumstantial evidence alone can be sufficient to convict a defendant of a crime. *See, e.g.,*

*Commonwealth v. Lovette, supra; Commonwealth v. Pronkoskie, supra; Commonwealth v. Berrios,* 495 Pa. 444, 434 A.2d 1173 (1981); *Commonwealth v. Scudder,* 490 Pa. 415, 416 A.2d 1003 (1980); *Commonwealth v. Libonati,* 346 Pa. 504, 31 A.2d 95 (1943). We recognize that the constitutional requirements of proving guilt beyond a reasonable doubt must still be satisfied. *Commonwealth v. Scudder, supra.* In testing the sufficiency of circumstantial evidence, however, we view it not alone but with the inferences and conclusions logically drawn from that evidence. *Commonwealth v. Meredith,* 490 Pa. 303, 310, 416 A.2d 481, 485 (1980). Any verdict based wholly on inference and suspicion must be overturned. *Commonwealth v. Rambo,* 488 Pa. 334, 412 A.2d 535 (1980). In order to protect against convictions on such speculation, all inferred facts "must flow, beyond a reasonable doubt, from the proven fact where the inferred fact is relied upon to establish the guilt of the accused or the existence of one of the elements of the offense." *Commonwealth v. Meredith, supra,* 490 Pa. at 310, 416 A.2d at 485.

■ Viewing the evidence in the light most favorable to the Commonwealth and drawing, as we must, all such logical inferences from it, the evidence is sufficient to support a finding of guilt on the murder charge. *Commonwealth v. Pronkoskie, supra; Commonwealth v. Kichline, supra.* Considering the evidence in that light, the following facts appear from the record. The victim was last seen at a shopping center around 6:15 p.m. on Saturday, January 16, 1982. The appellant was seen around 6:10 or 6:15 p.m. the same day at a beer distributorship adjoining the store outside of which the victim was waiting for her friend. The car the victim had occupied was found miles away from the shopping center the next day with her body nearby, although the car itself was first seen there about 9:30 on that same Saturday night. Its interior was burned, and the heat had stopped the victim's watch at 7:57 p.m.

January 16, 1982, was one of the coldest days of that year in Beaver County, with temperatures many degrees below

0°. Between 8:00 and 8:30 p.m. that frigid evening, the appellant appeared on foot at a house about one mile from where the victim's body was found. He was suffering from the cold and stated that he had been walking outside for a long time. He was not dressed for a walk in that weather. When he came inside, he asked the residents of the house if there were any scratches or blood on him. After warming himself, he was driven at his request to a convenience store beyond the mall where the victim had last been seen alive and where appellant's car remained. From there, he called a relative who took him to his own car at the mall where the abduction took place.

In talking to the police, appellant gave them several different false versions of his activities at the time of the crime. *See Commonwealth v. New,* 354 Pa. 188, 205, 47 A.2d 450, 460 (1946) ("The fabrication of false and contradictory accounts by an accused is a circumstance that militates against him."). This appellant gave four different false accounts of his activities on Saturday, January 16, 1982, in an effort to create an alibi. During questioning at the police station he initially stated that he was at a bar in Industry, from 11:00 a.m. to 11:00 p.m. that day. Later, when he knew that the police had contradictory information, he stated that he had left the bar for a short time and had come back at 10:00 p.m. Soon after that, he stated that he was first in a bar in Homewood about noon, where he had met two persons named Jeff and Bill. He then stated he went to Industry at 2:00 p.m., that Jeff and Bill met him there around 5:00 or 5:30 p.m., and they all left, going to several places in Ohio and Pennsylvania. While they were driving they argued, and he left the car, travelling on foot to the Tice residence. Finally, after his arrest, appellant told the Chief of Police that everything said earlier was wrong, that in fact he was with a married woman all day, and he had left *her* car to walk to the Tice house. Eyewitness testimony shows that appellant was in Industry until 4:00 p.m., in Monaca until about 6:00 p.m., and was next seen at the Tice residence soon after 8:00 p.m.

Uncontroverted evidence places the person who killed Mrs. Vespaziani at not one, but several precise locations at relevant times. That person would have been at the mall sometime between 6:15 and 6:30 p.m. (when Mrs. Vespaziani's companion left her car and returned to find it missing). Appellant was seen there around that time. Indeed, his car was parked in the same lot. The person who killed Mrs. Vespaziani would also have been in the vicinity of the victim's car shortly after her death. The victim's charred watch establishes that the car was burned around 8:00 p.m. that night. Therefore, the killer would have been in that sparsely populated area shortly before 8:00 p.m. The victim and the car disappeared at the same time. They were later found about half a mile apart. It is highly unlikely that the killer would have fled the scene in another car. Thus, a jury could properly infer that the killer left on foot. This appellant did appear on foot at an isolated farm house a little less than one mile from the car and the body shortly after 8:00 p.m.

Only a limited class of people were at each of these locations at the various times necessary to carry out the whole sequence of events which culminated in Mrs. Vespaziani's rape and murder. At each time pinpointed by an established fact, the intersection of these classes, i.e. those people who could have committed the killing, grows smaller and smaller. Moreover, the rate by which the class decreases accelerates by virtue of the logic of probabilities. There was potentially a large number of people at the shopping center at 6:15 p.m. There were substantially fewer people who were near the area where the body was found. Common membership in these two classes, however, cannot alone establish the identity of the murderer because the number of individuals common to both classes is still relatively large. The additional known facts set forth above do establish beyond a reasonable doubt that the appellant was a member of both those classes and the much more limited class of people who were walking in the open country within a short distance of the victim's body, not suitably

dressed for walking in such bitter weather at or about the time of the crime.

Other inferences bolster this analysis. Because appellant was not dressed for walking a great distance in the cold weather, the jury could have inferred that he had not planned to spend time outside, but was forced to do so by some emergency. Testimony about how cold he was at the house shows that he did walk some distance outside. This counterbalances any possible argument that he might have come from some nearby house. His own question about whether there were scratches or blood on him implies his knowledge that he had been involved in some recent struggle. The killer, also, would have been so involved because the record shows the victim resisted. Finally, the appellant's inconsistent statements show an attempt to conceal the truth. Such fear is relevant in determining the sufficiency of circumstantial evidence.

This Court has stated that mere presence at the scene of a crime is not sufficient to support a guilty verdict. *Commonwealth v. Keblitis,* 500 Pa. 321, 456 A.2d 149 (1983); *see also Commonwealth v. Jones,* 312 Pa.Superior Ct. 496, 459 A.2d 11 (1983). The evidence introduced by the Commonwealth does not go solely to presence. Appellant's question about whether there was any blood on his jacket does not establish mere presence; it allows the jury to infer, when viewed in favor of the Commonwealth, that he was at the scene and participated in the killing. The fact that appellant gave several inconsistent versions of his activities that day indicates not that he was in the car but, rather, that there was some attempt to hide his true whereabouts. These facts are evidence beyond mere presence at the time of the crime and support the jury verdict of first-degree murder.

From all these circumstances a jury could have first inferred beyond a reasonable doubt that the appellant was present when Sandra Vespaziani was raped and killed. From his statements, both what was and was not said by him at the farmhouse to which he walked and sought

shelter shortly after the crime, that same jury could infer beyond a reasonable doubt that he brutally raped and killed her. Although the evidence established that he was present at the scene of the crime he falsely stated to the people in the farmhouse that he had been thrown out of a car by some drinking buddies. Since he was present at the scene, his failure to mention anything about it, the burnt car, the body or any other fact concerning the crime, is inexplicable and as such forms another basis for an inference of guilt.[13] This inference is strengthened by his later lies to the police in an effort to establish an alibi. On such evidence the jury's finding that he had committed the crime must stand.

While no single item of evidence proves guilt, the evidence as a whole does provide a basis sufficient to sustain the jury's verdict. The class intersection analysis shows the probability is so small that persons other than appellant belonged to all of the relevant classes that the jury verdict convicting him must be sustained.

## B.

■ Appellant also claims that the prosecution did not prove that the killing was willful, deliberate or premeditated and thus did not rise to first-degree murder. This argument, too, must fail. While *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), precludes any presumption of premeditation from the mere fact that a deadly weapon was directed against a vital part, a jury may infer this requisite specific intent to kill from the particular manner in which a deadly weapon is used against a person. *Commonwealth v. Pronkoskie, supra; Commonwealth v. Meredith,* 490 Pa. 303, 416 A.2d 481 (1980). While the jury is not compelled to make that inference, a conviction based on it need not be overturned for insufficiency. The evi-

---

**13.** This inference does not violate the prohibition of using tacit admissions in criminal cases as appellant was not in custody nor in the presence of the police. *See Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *Commonwealth v. Coccioletti,* 493 Pa. 103, 114, 425 A.2d 387, 392 (1981) ("[i]mplied admissions made while free from custody, with no police present, are still admissible").

dence here shows that the victim died as a result of multiple knife wounds to the neck. From them, the jury is permitted to infer the specific intent to kill and to convict the appellant of first-degree murder when he was identified as the killer.

### C.

■ Appellant further claims that the prosecution's evidence was insufficient to support his convictions for rape, kidnapping, and indecent assault. This claim is based solely upon the allegation that the prosecution did not prove that penetration occurred prior to the death of the victim. Without that there would be no rape, as the crimes of rape and indecent assault pertain only to actions against living persons. *Commonwealth v. Sudler*, 496 Pa. 295, 436 A.2d 1376 (1981). He further asserts that if the rape conviction falls, there is no felony underlying the kidnapping charge, and that charge must fall as well.

Again viewing the evidence in the light most favorable to the Commonwealth, the record shows that penetration occurred prior to death. The coroner's testimony on this issue is enough to support the conviction. There was an antemortem abrasion in the left groin area, and the victim's anus was bruised. There were numerous scratches all over the victim's body, and her bra was torn. Appellant's argument is based on conflicting evidence which the jury did not have to accept.

### D.

■ Appellant's final insufficiency claim is that there was no proof of intent to deprive the victim of possession of the car. The act of burning the car is sufficient to show an intent to deprive the victim of ownership or possession. The natural consequence of that act is permanent destruction of the car. Therefore, we affirm the theft conviction.

### VII.

■ On the kidnapping charge, appellant argues that his conviction should be reversed because the instructions to

the jury so varied from the information that he was prejudiced in presenting his defense. There was indeed a technical variance between the information and the charge, in violation of Pa.R.Crim.P. 229. However, appellant suffered no prejudice from it in this case.

The information on the kidnapping charge reads:

[Appellant] unlawfully and feloniously remove[d] another a substantial distance under the circumstances from the place where found, or did confine another for a substantial period in a place of isolation, with intent to facilitate commission of a felony or flight thereafter, to-wit; rape....

Information, No. 115–A, Term, 1982 (Court of Common Pleas of Beaver County, March 24, 1982). This information corresponds with subsection (a)(2) of the kidnapping statute.[14] At trial, however, the following charge was given to the jury:

First, you must find that this Defendant, Charles Holcomb, removed Sandra Vespaziani a substantial distance, under the circumstances, from the place where he found her. Secondly—and I don't think that should be a problem if you find, in fact, the Defendant was the person. But, of course, as I said earlier, you must find not only a crime was committed, but you must find that this Defendant committed the crime. The second element, that this Defendant accomplished the removal by force, or threat of force, or both. *And the third element is that the Defendant accomplished the removal with intention to*

---

**14.** The relevant parts of the statute are as follows:

(a) Offense defined.—A person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

. . . .

(2) To facilitate commission of any felony or flight thereafter.
(3) To inflict bodily injury on or to terrorize the victim or another.

18 Pa.C.S. § 2901(a).

*facilitate the commission of a felony, in this case rape, or to inflict bodily injury, or terrorize the victim.* N.T. at 263 (emphasis added). Before the jury began its deliberations, defense counsel objected to the addition of the language corresponding to subsection (a)(3) of the statute because it was not contained in the information. That objection was overruled. The issue was raised at the post-trial stage (see Brief in Support of Post-Trial Motions at 63–64) and is properly before us on appeal.

Pa.R.Crim.P. 229 provides:

The court may allow an information to be amended when there is a defect in form, the description of the offense, the description of any person or any property, or the date charged provided the indictment as amended does not charge an additional or different offense. . . .

In this case, the court's charge to the jury improperly expanded on the information by stating a conviction could be based on either 18 Pa.C.S. § 2901(a)(3) or § 2901(a)(2). Such a change is not one of mere form. When new or different elements beyond those in the information are introduced, the variance is improper. In this case, the addition of § 2901(a)(3) theoretically allowed conviction for kidnapping on facts not essential to the intent to rape.

However, an improper variance is not necessarily fatal. The purpose of the information is to apprise the defendant of the charges against him so that he may have a fair opportunity to prepare a defense. *See Commonwealth v. Goldblum,* 498 Pa. 455, 447 A.2d 234 (1982) (relating to indictments).

On this record, the variance did not substantially prejudice the appellant by making his prior defense strategy inapplicable to the charge he had to face under the additional erroneous instruction. The Commonwealth's case was based solely on the rape. The trial court's charge was not in response to new information, failure to prove the rape or any other change in circumstances. The only evidence presented to support either underlying intent was the rape. This distinguishes our case from *Commonwealth v. Neal,*

274 Pa.Superior Ct. 225, 418 A.2d 378 (1980), where the court's charge was wholly based on a separate and distinct subsection of our theft statute.

## VIII.

Appellant advances several arguments against the imposition of the death sentence in this case. Appellant objects generally and specifically to our death penalty statute, 42 Pa.C.S. § 9711. Appellant's specific claims, not previously addressed by this Court, are:

(1) that the mandatory nature of the statute after weighing all of the factors deprives appellant of his right to an individualized sentencing determination;

(2) that aggravating circumstances, 42 Pa.C.S. § 9711(d)(6) and § 9711(d)(9),[15] are overbroad and thereby lead to arbitrary imposition of the death penalty; and

(3) there was insufficient evidence to support the jury finding of those aggravating circumstances.

We now conclude that these arguments do not present grounds to invalidate either the death penalty statute or the sentence in this case.[16]

15. (d) *Aggravating circumstances.* —Aggravating circumstances shall be limited to the following:

. . . . .

(6) The defendant committed a killing while in the perpetration of a felony.

. . . . .

(9) The defendant has a significant history of felony convictions involving the use or threat of violence to the person.
42 Pa.C.S. § 9711(d)(6) and § 9711(d)(9). These are the only aggravating circumstances the Commonwealth attempted to prove in this case.

16. The dissents note that the jury in its verdict slip arguably found the aggravating circumstance of a significant history of felony convictions, 42 Pa.C.S. § 9711(d)(9), to exist. Its contention that this circumstance is not supported by the evidence depends upon the dissenter's interpretation of the statute, an interpretation we reject. *See, infra,* at 459–465. The other irregularities in the verdict slip were adequately dealt with by the trial court when it said:

[We] cannot realistically expect the jury to be able to quote the provisions of the sentencing code verbatim. If the jury's findings

A.

■ The statute is facially constitutional. *Commonwealth v. Zettlemoyer, supra.* Under the statute, a separate sentencing proceeding is held after a conviction for first-degree murder. 42 Pa.C.S. § 9711(a)(1). The jury must decide between life imprisonment or death. *Id.* The Commonwealth can present evidence only as to the aggravating circumstances set out in the statute, 42 Pa.C.S. § 9711(a)(2), and these must be proved beyond a reasonable doubt. 42 Pa.C.S. § 9711(c)(1)(iii). The defense may present mitigating evidence relevant to the imposition of the sentence. 42 Pa.C.S. § 9711(a)(2). The statute suggests certain categories of mitigating evidence but does not limit the evidence to those categories. The jury is instructed that if the aggravating circumstances outweigh the mitigating circumstances, or if there are aggravating circumstances and no mitigating circumstances, the sentence must be death. 42 Pa.C.S. § 9711(c)(1)(iv).

are compatible with the evidence and the applicable law, the Court will not interfere with the jury's fact finding function.

Trial ct. slip op. at 19 (*en banc*). This is not a situation where the jury heard evidence on or found an improper aggravating circumstance. Although the United States Supreme Court, in two such cases, has refused to overturn a death sentence, in those cases the state statutes were different from ours. In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Court held that although an improper aggravating circumstance was presented to the jury, there was no reason to overturn the death sentence because there were sufficient other aggravating circumstances to warrant the death sentence and the Georgia statute did not require the jury to weigh aggravating against mitigating circumstances. In *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the judge specifically found several aggravating circumstances, one of which was improper under state law, but there were no countervailing mitigating circumstances. Thus, the Court refused to overturn that death sentence. However, if such a situation occurred in Pennsylvania we would be required to vacate the death sentence, at least where, as here, mitigating circumstances were present. *See infra* at 850–851. This might not be the case where no mitigating circumstances are found, *see, e.g., Commonwealth v. Maxwell,* 505 Pa. 152, 477 A.2d 1309, *cert. denied,* ___ U.S. ___, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984). However, because the jury in this case heard only proper evidence and considered only proper aggravating circumstances, although expressing them in laymen's terms, there are no grounds for reversal on this point.

Any death sentence is subject to automatic review by us. 42 Pa.C.S. § 9711(h)(1). We are directed to affirm the sentence of death unless (a) it was the "product of passion, prejudice or any other arbitrary factor;" (b) there is insufficient evidence to support the finding of one or more of the aggravating circumstances; or (c) the sentence is excessive or disproportionate to the penalty in similar cases, looking at the nature of the crime and the defendant. 42 Pa.C.S. § 9711(h)(3)(i–iii).

This sentencing procedure was enacted by the legislature to fulfill the constitutional requirements established by us and by the United States Supreme Court. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977), *cert. denied,* 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978). As noted, the basic scheme of the statute has previously been held constitutional. *Commonwealth v. Zettlemoyer, supra.* Thus, appellant's frontal attack on the statute fails.

## B.

▮▮ 42 Pa.C.S. § 9711(h)(3)(ii) states that we shall affirm the death sentence unless:

the evidence fails to support the finding of an aggravating circumstance specified in subsection (d).

Although the statute could be read as allowing the sentence to stand, if there is at least one valid aggravating circumstance, despite presentation of an improper aggravating circumstance, we hold that if the prosecution presents to the jury an aggravating circumstance that is not supported by sufficient evidence the sentence must be vacated. This

view requires us to consider whether the evidence in this case is sufficient to support the jury's finding, in its own lay terms, that appellant had a "significant history of felony convictions." 42 Pa.C.S. § 9711(d)(9). Before proceeding to this particular sufficiency issue, however, we believe we should set out the reasoning behind our interpretation of 42 Pa.C.S. § 9711(h)(3)(ii).

Although our statute allows imposition of the death penalty when supported by even one aggravating circumstance, if there is an improper aggravating circumstance presented to the jury it is impossible to tell from the record how the jury would have decided absent the improperly presented circumstance.

Under our statute, the jury must engage in a weighing of aggravating against mitigating circumstances.[17] It must specify which aggravating circumstances it found, but is not required to state what mitigating circumstances are found. Thus, there can be no meaningful appellate review of the weighing process (a review we undertake independently, *see Zettlemoyer, supra*) to determine whether the jury's consideration of the improper circumstance was harmless error beyond a reasonable doubt. *See Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978) (harmless error must be proved beyond a reasonable doubt as a matter of our general state law), and *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (where the error is constitutional, federal law requires its harmless nature be demonstrated beyond a reasonable doubt).

To conclude otherwise would permit the carrying out of a death penalty without the meaningful appellate review we must undertake. Thus, even though there is plainly sufficient evidence to support one of the aggravating circumstances in this case, *see infra* part VIII (C), we must

17. *See supra* note 16 for a discussion of *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), cases where the United States Supreme Court upheld a death sentence prompted in part by improper aggravating circumstances but there was no weighing as in our statute.

determine whether there is sufficient evidence to support all of the circumstances presented to the jury.

Our statute limits the jury's discretion to this weighing process, allowing it to impose a death sentence only if the aggravating circumstances outweigh the ones that mitigate. Section 9711(h)(3)(i) provides that we must vacate the death sentence if it is the product of "passion, prejudice or any other arbitrary factor." If a jury is given a false counter on the side of death, an *a posteriori* imposition of the mandated death penalty is necessarily arbitrary. Thus, § 9711(h)(3)(i) is violated in such a case and *Zant* and *Barclay, supra,* are inapposite. *See. supra* note 16. In imposing a death sentence a jury must have discretion to relate the propriety of that sentence to the particular facts and circumstances of the case. That discretion, under our statute, occurs in the weighing process and must be exercised on the basis of proper considerations if it is not to be arbitrary.

In this connection, appellant argues that the evidence presented by the prosecution was insufficient to show a "significant history of felony convictions," 42 Pa.C.S. § 9711(d)(9). The history presented was appellant's 1973 convictions for rape and assault with intent to ravish. These two convictions were merged for sentencing purposes but still appear on the record.

As Mr. Justice Zappala stated for the Court in *Commonwealth v. Goins,* 508 Pa. 270, 495 A.2d 527 (1985), the legislative definition of this particular aggravating circumstance requires more than one prior conviction. He noted, again speaking for the Court, that as the number of prior convictions grows, the significance of this prior history also increases. In this sense, significance clarifies and intensifies the normal meaning of the plural number in the statutory term "convictions" and demonstrates that the minimum number of convictions which a jury can consider significant is two. The term "significant," however, also relates to the qualitative relationship between the prior conviction and the present homicide prosecution. Thus,

where the defendant shows a willful and persistent refusal to curb a propensity towards a particular type of violent aggression against others, the prior convictions gain in significance.[18] The statute does not merely ask the jury to count previous crimes and determine significance on their number alone. The definition of this particular aggravating circumstance shows a legislative intent that a jury should only be allowed to impose the death penalty for this aggravating circumstance in cases where the prior history of convictions shows the defendant has pronounced recidivistic tendencies. This aspect of significance is largely for the jury, cf. Commonwealth v. Szuchon, 506 Pa. 228, 484 A.2d 1365 (1984); Commonwealth v. Beasley, 504 Pa. 485, 475 A.2d 730 (1984) (relating to 42 Pa.C.S. § 9711(e)(1), the mitigating circumstance "no significant history of prior criminal convictions"), yet some guidelines can be given. For example, two prior convictions, one for robbery and one for an accompanying aggravated assault, satisfy the legal test of quantity but are not necessarily factually significant in relation to a murder committed during a family quarrel. Likewise, a history of rape and indecent assault would be a less "significant history" for sentencing on a murder committed during a robbery than on one committed during a rape or sexually motivated aggravated assault.

A larger number of prior convictions for robbery would reduce the need to discover a connecting thread between the nature of the crimes, because the number itself strengthens the showing of the pronouncedly recidivistic violent tendency that is the relevant factor in imposing punishment in general and, in particular, for the especially

---

**18.** We already have stated the proper method for bringing the facts of prior cases to the attention of the jury. In *Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460 (1984), we stated:

[R]eason impels that the construction of the term "convictions" in 42 Pa.C.S.A. § 9711(d)(9) be such as to permit consideration of the essential and necessary facts pertaining to the convictions, including the circumstances of the crimes and the sentences imposed.

505 Pa. at 289, 479 A.2d at 465. This limitation allows the jury to consider the basic aspects of prior cases without conducting a virtual retrial of the prior case.

egregious aggravating circumstances the Legislature has seen fit to specify in the statute imposing and limiting capital punishment. Similarly, the jury might be instructed that a high degree of correlation between the present and the past history weighs in favor of significance, while a minimum number of previous convictions lightens the scales. Thus, a jury might be more inclined to treat two prior robbery convictions as significant in every respect if the murder were committed in the course of a robbery.[19] In doing so, it would be correct under the statute.

■■■■ In this case, appellant's prior convictions involve the rape of a woman and an indecent assault on her. The present prosecution concerns the rape and murder of a woman. The striking similarity between the incidents allows the jury to consider the prior incidents as a "significant history," even though the two prior convictions were merged for sentencing. The fact that no separate sentence was imposed for the assault does not make it any less a conviction for death penalty purposes. *See Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983), *cert. denied*, — U.S. —, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984) (stating that conviction does not mean that sentence was imposed).[20] Moreover, it does not seem to us that a transactional analysis of the type appropriate in considering issues of double jeopardy is controlling in deciding whether a convicted murderer's prior conduct exhibits the uncontrolled recidivistic tendencies to violent assaults upon the person likely to result in death which the Legislature determined warrant

**19.** This analysis is consistent with our cases involving 42 Pa.C.S. § 9711((a)(9). *See Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309 (1984); *Commonwealth v. Beasley*, 504 Pa. 485, 475 A.2d 730 (1984); *Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460 (1984); *Commonwealth v. Goins*, 508 Pa. 270, 495 A.2d 527 (1985); *Commonwealth v. Frederick*, 508 Pa. 527, 498 A.2d 1322 (1985); *Commonwealth v. Cross*, 508 Pa. 322, 496 A.2d 1144 (1985).

**20.** This less restrictive definition of conviction arguably could allow the kidnapping and rape in this case to constitute part of the significant history of felony convictions. Further, this definition of convictions also supports the proposition that several convictions arising out of the same criminal episode nevertheless are separate convictions for the purpose of establishing a significant history.

death. Indeed, such analysis in terms of a single transaction may not even be appropriate or relevant to this particular sentencing determination. The similarity between appellant's prior violent aggression and the killing here is so plain that no instruction was necessary on this record. Indeed, an instruction pointing out that similarity and relating it to significance would have only hurt appellant.

Our construction of this particular aggravating circumstance protects the statute from unconstitutional vagueness. The United States Supreme Court has stated that death penalty statutes must adequately channel the discretion given to the sentencing jury so that the death penalty is not imposed on arbitrary or capricious grounds. *See Furman, supra; Lockett, supra; Gregg, supra.*

In *State v. David,* 468 So.2d 1126 (La.1984), *opinion supplement on different grounds,* 468 So.2d 1133 (La. 1985), the Louisiana Supreme Court struck down the portion of its death penalty statute that treated past crimes as an aggravating circumstance. The relevant circumstance in Louisiana was whether the defendant had "a significant prior history of criminal activity." LSA–C.Cr.P. Art. 905.-4(c). The Louisiana statute does not even limit the relevant history to felonies, let alone to felonies involving personal violence. The Supreme Court of Louisiana reasoned that the language of that statute was inadequate because "significant" was "wholly subjective and unrestricted." 468 So.2d at 1129. In addition, it found the terms "prior" and "criminal activity" vague. Its most serious problem was with the phrase "criminal activity." That phrase could, arguably, include arrests as well as convictions, misdemeanors as well as felonies, and juvenile as well as criminal proceedings. Our statute avoids these difficulties by the legislative specification that only violent felony convictions can be considered.

The Louisiana Court refused to limit the broad language of its statute to avoid the infirmity. It stated that to do so would violate the "obvious intent" of the legislature to give the jury wide discretion. 468 So.2d at 1132. The Pennsyl-

vania statute is narrower and contains clear indications of legislative intent which allow us to define the statutory terms and avoid such constitutional infirmities by channeling the jury's discretion. *See Gregg, supra,* 428 U.S. at 206, 96 S.Ct. at 2940.

As we stated in *Goins, supra,* the language of our statute requires a "history" of more than one conviction before a jury can find it "significant." Our legislature also limited the types of offenses which constitute such a history to felonies involving either the use, or threat, of violence to the person. Finally, our legislature chose the word "significant" rather than "substantial," the word used in certain other statutes held unconstitutionally vague. *See Arnold v. State,* 236 Ga. 534, 224 S.E.2d 386 (1976); *Gall v. Commonwealth,* 607 S.W.2d 97 (Ky.1980) ("substantial history of serious assaultive convictions"). This limitation relating to the qualitative connection between past and present crimes adequately channels the jury's discretion. The states which have similar statutes do not use the term "significant" in conjunction with a limitation on the quantity and type of prior criminal activity to be considered.[21]

These differences between our statute and the others cited are crucial. The term "substantial" is a term connoting quantity. We define quantity by using the plural. *Commonwealth v. Goins, supra.* "Significant," on the other hand, conveys not only the concept of numerosity but also "relevance." The legislature's use of this term in our statute channels the jury's discretion in the application of this aggravating circumstance, thus avoiding constitutional infirmity. It places limits on both the character of the prior convictions and their quantity, and gives guidelines on the

---

**21.** *See* Ark. Crime Code Ch. 13 § 41–1303(3) (1977) ("previously committed another felony involving the use of threat or violence"); Conn. Gen.St. § 53A–46A(g)(2) (1980) ("one or more convictions for crimes involving serious bodily harm which are punishable at one or more years"); S.D. Codified Laws § 23A–27A–1(1) (1981) ("substantial history of serious assaultive criminal convictions"); Mo.Rev.Stat. § 565.-032.2(1) (1984) ("one or more serious assaultive criminal convictions"); Neb.Rev.Stat. § 29–2523(1) ("substantial history of serious assaultive or terrorizing criminal activity").

relationship between the prior history and the case at bar. None of the other cited statutes contain all of these restrictions.

 As the United States Supreme Court has stated, it is impossible to develop a perfect sentencing system. *Lockett, supra,* 438 U.S. at 605, 98 S.Ct. at 2965; *see also Zettlemoyer, supra,* 500 Pa. at 57, 454 A.2d at 959. Every jury must make decisions based on some subjective factors. Death penalty statutes are constitutional as long as the jury's discretion is sufficiently channeled to prevent it from imposing a death penalty on irrational concerns. Our statute as here interpreted and applied does sufficiently channel jury consideration of the factors which warrant the imposition of the death penalty. *See Furman, supra.*

## C.

 Appellant also attacks aggravating circumstance six, "killing in the perpetration of a felony," 42 Pa.C.S. § 9711(d)(6), as overbroad and facially defective. We hold it is not so broad that it necessarily leads to arbitrary imposition of the death penalty.[22] The act as a whole has sufficient safeguards to prevent improper imposition and, on this record, we find no indication of such arbitrary action.

Because the statute applies whenever someone is killed during the perpetration of *any* felony, appellant argues that the death sentence might be imposed in situations that would not warrant it.[23] This argument is based on the many non-violent felonies in our statutes that may not warrant the death penalty. Considered in isolation, that argument seems plausible. However, our statute also pro-

22. Appellant also claims that the evidence is insufficient for circumstance § 9711(d)(6), killing during the perpetration of a felony. His argument is based on the arguments previously discussed relating to his conviction for the accompanying charges. There is no need to discuss them again as we have upheld the conviction in this case. *See supra* at 847–849.

23. "[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett, supra,* 438 U.S. at 605, 98 S.Ct. at 2965.

vides that the circumstances of the offense may mitigate against the death penalty. 42 Pa.C.S. § 9711(e)(8). Thus, if a killing occurs during a non-violent felony the jury has the opportunity to weigh the factors presented on both sides. Further protection is afforded through the proportionality review that this Court must undertake. 42 Pa.C.S. § 9711(h)(3)(iii). These checks sufficiently protect the statute against facial invalidity. The circumstances of the felony committed in this case are plainly sufficient to protect this jury's action against the charge that it acted arbitrarily. Thus, the statute is not unconstitutional as applied.

■ Appellant also claims, however, that this particular aggravating circumstance, 42 Pa.C.S. § 9711(d)(6), does not sufficiently separate the cases in which the death penalty might be imposed from those outside that class. *See Furman v. Georgia, supra,* 408 U.S. at 313, 92 S.Ct. at 2764 (White, J., concurring) (commenting that "there is no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not"). Appellant argues that the requirements of our statute would be satisfied for any killing committed during a felony, and thus capital cases merge with cases of second-degree (felony) murder. We disagree. Appellant's interpretation would be accurate if the legislature intended to include in the class of aggravating felonies those felonies which are lesser-included offenses of murder, such as aggravated assault, 18 Pa.C.S. § 2702(a)(1). Such an interpretation would be not only unconstitutional, but also inconsistent with 18 Pa.C.S. § 2502(b), felony murder. Aggravating circumstances under § 9711 require distinctions sufficient to separate the particular killing which warrants death from other homicides. Lesser-included offenses or degrees of murder are, by definition, not separating factors.

Felony murder, second-degree murder under our present Crimes Code, lacks an essential element of the crime of murder in the first degree which must underly a capital case. Felony murder can be properly found when a person

commits a felony which results in death even though the death is not specifically intended. In such cases, the malice essential to the crime of murder in any degree can only be inferred from the intent to commit the underlying felony.[24] First-degree murder, however, requires actual malice, proved by willful or premeditated actions specifically intended to kill. The difference between first-degree murder and felony murder lies in the source of the requisite malice. Therefore, felony murder is not automatically a lesser-included offense of first-degree murder:

> The offenses are distinct in the sense that they have different elements. One requires that the slaying be done with 'deliberate and premeditated malice,' the other requires that the killing occur in the course of certain enumerated felonies.

*Fuller v. United States*, 407 F.2d 1199, 1224 (D.C.Cir.1968) (*en banc*), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969) (footnote omitted). *Fuller* also states cases can be posed in which facts would support either of these alternative theories. It is such a case that our aggravating circumstance, 42 Pa.C.S. § 9711(d)(6), covers. It requires both specific intent and the commission of a separate felony. Under *Fuller* and our statute, therefore, felony murder is not a sub-class of first-degree murder although those distinct types of homicides sometimes share common elements.

The felony which is an aggravating circumstance under our capital punishment statute is proved only after the jury has convicted a defendant of first-degree murder and then, during the sentencing phase, finds that, in addition to the willful premeditation needed for conviction for first-degree murder, the defendant committed another felony from which the malice necessary to a murder conviction in any degree could have been inferred in support of his conviction

24. "[T]he malice necessary to make a killing, even an accidental one, murder, is constructively inferred from the malice incident to the perpetration of the initial felony." *Commonwealth v. Tarver*, 493 Pa. 320, 328, 426 A.2d 569, 573 (1981) (quoting *Commonwealth v. Yuknavich*, 448 Pa. 502, 509, 295 A.2d 290, 292 [1972]).

for the lesser crime of second-degree murder. If this extra element is proved during the sentencing phase, it sufficiently separates capital from non-capital murders.

■ On this record, we find that this case presents the type of murder the Legislature intended to cover by this aggravating circumstance. The victim was kidnapped from a public place, driven to a rural area and raped, and then murdered. Thus, the application of the aggravating circumstance to this offense is constitutional in theory and application.

### D.

Finally, appellant argues that the Pennsylvania death penalty statute is mandatory and that it has a requirement of mechanical application which renders it unconstitutional. *See Woodson, supra; Roberts, supra.* He claims that eliminating the possibility of a mercy verdict violates the Eighth and Fourteenth Amendments requirement that there be an individualized, particularized sentencing in each case. We disagree because our statute, on analysis, does provide room for a jury to individualize the imposition of death sentences despite language which appears mandatory.

The argument that our death penalty statute is mandatory arises out of its following provision:

[T]he verdict *must* be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.

42 Pa.C.S. § 9711(c)(1)(iv) (emphasis supplied). So-called "permissive" statutes do not have this requirement, leaving open the possibility that life imprisonment may be imposed in any case. The United States Supreme Court has not approved or disapproved a mandatory sentencing system.[25]

---

**25.** The mandatory system should not be confused with automatic death penalty statutes under which the death penalty must be imposed

The courts of several states have repeatedly upheld systems similar to ours. *State v. Dicks,* 615 S.W.2d 126 (Tenn.), *cert. denied,* 454 U.S. 933, 102 S.Ct. 431, 70 L.Ed.2d 240 (1981); *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *State v. McKenzie,* 186 Mont. 481, 608 P.2d 428, *cert. denied,* 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980).

The United States Supreme Court has identified two principles that impose polar limits on death penalty legislation: sufficient flexibility to ensure individualized determination, *see Lockett, supra,* 438 U.S. at 604, 98 S.Ct. at 2964, and sufficient precision to guard against arbitrary and discriminatory imposition, *see Furman, supra,* 408 U.S. at 309–310, 92 S.Ct. at 2762–63 (Stewart, J., concurring). A system that provides for automatic death sentences may protect against the discrimination condemned in *Furman,* yet arbitrarily impose death without regard to individualized circumstances. However, a system which gives the sentencer discretion may lead to discriminatory imposition. The United States Supreme Court has recognized there is no perfect sentencing system, *Lockett, supra,* 438 U.S. at 605, 98 S.Ct. at 2965, as has this Court, *Zettlemoyer, supra,* 500 Pa. at 57, 454 A.2d at 959. Our statute steers a course between the rock of draconian imposition and the whirlpool of discrimination by requiring death for narrowly defined aggravating circumstances, but allowing an almost unlimited presentation and consideration of mitigating circumstances. *Id.* Indeed, a less extensive catalogue of mitigating circumstances in a prior statute has failed our constitutional scrutiny. *Commonwealth v. Moody, supra.*

Rather than attempting a precise balance between these opposing forces, our statute allows a jury to determine when the death penalty should be imposed in an individual case but only upon defined circumstances. Its decision

in certain situations. *See Woodson v. North Carolina, supra; Roberts v. Louisiana, supra; see generally* Ledewitz, *The Requirement of Death: Mandatory Language in the Pennsylvania Death Penalty Statute,* 21 Duq.L.Rev. 103 (1982).

must be based on the aggravating circumstances set out in the statute only after they are weighed against the broader possible range of mitigating circumstances suggested by those in the statute.[26] The jury balances the precisely defined aggravating circumstances against the extensively allowed mitigating circumstances before imposing the death penalty.

Nevertheless, appellant suggests that our statute, by eliminating the possibility of a mercy verdict in which the jury may impose life imprisonment on either whim or reason, is unconstitutional. This argument rests on the premise that in order for the jury to conduct the individualized determination of the sentence required by *Lockett, supra,* 438 U.S. at 602, 98 S.Ct. at 2963, a mercy verdict must be available as a way of expressing the "contemporary community values" that have to be included in a sentencing decision on a capital offense. *See Gregg, supra,* 428 U.S. at 181, 96 S.Ct. at 2928 (citing *Witherspoon v. Illinois,* 391 U.S. 510, 519, n. 15, 88 S.Ct. 1770, 1775, n. 15, 20 L.Ed.2d 776 [1968]). The inclusion of such views is said to aid in determining whether the death penalty is a cruel and unusual punishment in a particular case. This argument confuses the functions of legislature, court and jury. Pro-

---

**26.** It has been suggested that our death penalty statute strictly limits the information that may be presented as evidence of mitigating circumstances. *See Ledewitz, supra,* at 106, 109 and n. 30. Professor Ledewitz is incorrect. While our statute does set out eight categories of mitigating circumstances, it does not automatically preclude other evidence. This can be demonstrated by the language of the statute itself. The aggravating circumstances are prefaced by the phrase, "shall be limited to." § 9711(a). The mitigating circumstances are set out by the phrase "shall include." § 9711(e). While a possible interpretation of this last phrase could be that the mandatory inclusion of these categories meant to exclude everything else, we think a more reasonable interpretation would be to allow other evidence subject to general relevancy requirements. If the legislature wanted to strictly limit the mitigating evidence it would have done so by the same clear language used for the aggravating circumstances. Such a difference must be interpreted as meaningful. The United States Supreme Court in *Proffitt v. Florida, supra,* indicated it is when it analyzed the Florida death penalty statute. 428 U.S. at 250, n. 4, 96 S.Ct. at 2964, n. 4. Therefore, evidence may be presented beyond the eight categories listed.

ponents of this view see the mercy verdict as a way for those values to be applied in a particular case as opposed to the more general political effect they have on the legislature considering the enactment of a death penalty or on a court judicially interpreting the Eighth Amendment.

A mercy verdict may or may not accurately represent the community views on the death penalty. Its allowance will certainly make it difficult to avoid the discriminatory imposition of that penalty which the United States Supreme Court condemned in *Furman, supra.* There are other, more effective ways to introduce the strains of mercy into the sentencing process. Our legislature introduced them through the weighing process required of the jury when any mitigating factor is presented. In so weighing the broad, almost unlimited, mitigating factors our statute permits, the way is open for the jury to enter into individualized discussion of the sentence in each case. It is required to impose death only after it has balanced all of the precise aggravating and broad mitigating factors in our statute, including those related to the character of the defendant and the circumstances and nature of the offense. *See* 42 Pa.C.S. § 9711(e)(8). The jury thus has opportunity to consider all the factors favoring a life sentence under contemporary community views.

Moreover, the defense has an opportunity to present evidence beyond the mitigating factors expressly set out in the statute. The only limitation is that of general relevancy. *See supra,* at 470, n. 26. The trial judge must also initially determine these issues of relevancy under contemporary community standards.[27] Improper exclusion can be remedied on appeal to this Court, either through a finding of trial error or on proportionality review. The opportunity for a mercy verdict is merely one particular method of injecting contemporary community views into the sentenc-

27. While some might argue that to exclude any evidence would make the death penalty less reliable, we believe that exclusion for irrelevancy is proper under the Constitution.

ing process.[28] Our legislature has chosen an alternate means by permitting, indeed requiring, a jury to weigh the broadest possible range of mitigating factors.

 In this case, appellant offered and introduced facts in mitigation covered by 42 Pa.C.S. § 9711(e)(8), relating to his own character and record and the circumstances of this particular offense. No evidence he offered was excluded during the sentencing hearing. Thus, the jury was not precluded from considering any mitigating evidence appellant offered and there is no indication it failed in its duty of weighing the mitigating factors which he did present against the aggravating circumstances the Commonwealth proved.

 Our statute precludes only an absolute mercy verdict. As such, we do not believe it violates any of the constitutional guidelines set out by this Court or the United States Supreme Court. Indeed, to allow such a verdict seems to us to run afoul of the prohibition against discriminatory imposition in *Furman*, which invalidated earlier statutes leaving the sentence to a court's unbridled discretion. The jury has a full and adequate opportunity to find that the death penalty is not appropriate in a given case. It is not mandated except in the rare circumstance where the defendant has not presented or proved any mitigating circumstances. *See, e.g., Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309, *cert. denied*, —— U.S. ——, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984). As the representative of the people, our legislature has set forth aggravating circumstances which it believed fairly represent those types of first degree murder that warrant the death penalty under contemporary views. Whether it correctly did so is a legal issue for the courts in interpreting the Eighth Amendment, not a factual issue for a sentencing jury. The legislature is free to change those categories should public views change, and the jury has an opportunity to use its judgment during the

28. The Governor's authority to commute a sentence, 42 Pa.C.S. § 9711(i), might be considered the permissible substitute for a mercy verdict were we to hold that such an option must be made available.

balancing process it must apply in each particular case. As a final check, this Court is required to independently examine the record in every death penalty case to protect against its inappropriate use.

## IX.

 Finally, we have a statutory duty to determine whether the sentence imposed in this case is excessive or disproportionate to sentences in similar cases. 42 Pa.C.S. § 9711(h)(3)(iii). In *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, *cert. denied*, —— U.S. ——, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), we directed the Administrative Office of Pennsylvania Courts to gather information on all convictions for first-degree murder after September 13, 1978 (the effective date of the current sentencing procedure). We have reviewed the information thus compiled, and determine the penalty in this case is not excessive or disproportionate.

The sentence is affirmed.[29]

McDERMOTT and PAPADAKOS, JJ., concur in the result.

NIX, C.J., files a concurring and dissenting opinion.

LARSEN, J., files a concurring and dissenting opinion.

ZAPPALA, J., files a dissenting opinion.

NIX, Chief Justice, concurring and dissenting.

While I continue to find fault with the vague and thus far unclarified weighing process prescribed by 42 Pa.C.S. § 9711(c), *see Commonwealth v. Zettlemoyer*, 500 Pa. 16, 81, 454 A.2d 937, 971 (1982) (Nix, J., dissenting), the instant record reveals that the jury deviated so far from even that statutory procedure as to require that the resulting death sentence be set aside.

---

**29.** The Prothonotary of the Western District is directed to transmit to the Governor a full and complete record of the proceedings of this case, both in the trial court and in this Court. 42 Pa.C.S. § 9711(i).

The Commonwealth attempted to prove only two (2) aggravating circumstances, that "[t]he defendant committed a killing while in the perpetration of a felony," 42 Pa.C.S. § 9711(d)(6), and that "[t]he defendant has a significant history of felony convictions involving the use or threat of violence to the person," 42 Pa.C.S. § 9711(d)(9). The jury's sentencing verdict in this case, however, reveals their total confusion as to the possible aggravating circumstances which hopelessly infected the weighing process.

The jury found three purported "aggravating circumstances" and concluded that they outweighed any mitigating circumstances. However, those "aggravating circumstances" are nowhere to be found in the death penalty statute. As recorded on the verdict slip, those circumstances were: "[1] Wilfully taking the life of another. [2] Repeated offenses. [3] Failure of rehabilitation." The first and third findings do not correspond to any of the aggravating circumstances enumerated by the legislature, see 42 Pa.C.S. § 9711(d), and are thus clearly irrelevant to the jury's sentencing decision, as the trial court conceded.

Finding number two (2), "[r]epeated offenses," while somewhat similar to statutory aggravating circumstance number nine (9), is sufficiently broad as to encompass crimes of any nature, including non-violent felonies and misdemeanors. To permit non-violent felonies or misdemeanors to support a finding of an aggravating circumstance permitting the imposition of the sentence of death is clearly not permitted under the legislative scheme. Nevertheless the purported aggravating circumstance found by this jury, i.e., repeated offenses, could well have referred to such crimes.

The jury's purported finding of aggravating circumstance number one—"wilfully taking the life of another"—is obviously not appropriate. This finding is the predicate for the verdict of murder in the first degree. For the jury to consider this factor as the basis for the imposition of the death sentence reflects a fundamental confusion between a finding of murder of the first degree and a finding of an

aggravating circumstance that would justify the imposition of the sentence of death. To contend that this merely suggests the jury's inability "to quote the provisions of the sentencing code verbatim", *see* majority opinion fn. 16, provides a gloss which is not worthy in a matter as serious as this.

The jury, which found but did not describe mitigating factors in appellant's favor, weighed them against at least two improper aggravating factors of their own invention. Thus the weighing process engaged in was totally invalid. To permit the resulting determination to stand would shock the conscience and offend even the most minimal notion of due process.[1]

Moreover, even assuming *arguendo* that the jury found one statutory aggravating circumstance, i.e., number (9), the evidence would not support such a finding. Appellant's "significant history" of violent felony convictions consists of a 1973 conviction on charges of rape and a lesser included offense, assault with intent to ravish, the two crimes merging for purposes of sentencing.[2] Without denigrating the seriousness of those charges, I refuse to accept the majority's conclusion that this prior record is sufficient to establish the requisite "significant history" contemplated by

1. Neither *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), nor *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), supports the constitutionality of the sentence in the instant case. In *Zant* the United States Supreme Court considered a death sentence imposed pursuant to a statutory scheme which did not provide for the weighing of aggravating and mitigating circumstances. The Court explicitly reserved judgment on the effect of the finding of an invalid aggravating circumstance where such a weighing process is statutorily mandated. *Zant v. Stephens, supra*, 462 U.S. at 890, 103 S.Ct. at 2749, 77 L.Ed.2d at 258. Although the Florida death penalty statute subsequently reviewed in *Barclay* did provide for the weighing of aggravating circumstances against mitigating circumstances, the death sentence upheld in that case was predicated upon a finding of four valid aggravating circumstances and no mitigating circumstances. In the instant case the jury found there were mitigating circumstances.

2. Assault with intent to ravish, a crime under the Penal Code of 1939, *see* Act of June 24, 1939, P.L. 872, No. 375, § 722, 18 P.S. § 4722 (repealed 1972), merged with rape. *Commonwealth ex rel. Shaddock v. Ashe*, 340 Pa. 286, 17 A.2d 190 (1941).

the statute. Clearly the legislature, in using the term "history" and the plural "convictions," [3] intended multiple violent felony convictions over a period of time to be an aggravating circumstance. In drafting the aggravating circumstance section of the death penalty statute, the legislature made a clear distinction between convictions for which a sentence of death or life imprisonment was imposable, 42 Pa.C.S. § 9711(d)(10), and other violent felony convictions, 42 Pa.C.S. § 9711(d)(9). A single prior conviction of "another" offense of the former category constitutes an aggravating circumstance, as opposed to the "significant history" of convictions of the latter, less serious, type required to establish an aggravating factor under section (d)(9). If it had intended a single conviction to satisfy that section (d)(9), the legislature could have expressly provided, "The defendant has been convicted of *another* felony conviction involving the use or threat of violence to the person"; it did not. Instead, the legislature chose the phrase "a significant history."

Moreover, if a single conviction of a violent felony for which the maximum sentence is less than life imprisonment can support the finding of an aggravating circumstance, the qualitative difference in degree of culpability between a crime such as voluntary manslaughter and first degree murder would be obliterated. A prior conviction of either offense would be an aggravating circumstance even though society considers one crime to be much more serious than the other. In addition, section (d)(10), which is limited to prior convictions for which a sentence of death or life imprisonment was imposable, becomes mere surplusage. Any conviction which satisfied section (d)(10) would also be an aggravating circumstance under section (d)(9).

---

3. Even if one accepts the view that multiple felony convictions arising from a single criminal episode may be offered to establish "significant history" as contemplated by section (d)(9), *see Commonwealth v. Goins,* 508 Pa. 270, 495 A.2d 527 (1985), such an interpretation should not apply to a major felony and a lesser included offense. Here the crime of assault with intent to ravish was clearly a component of the rape charge. *See* footnote (2), *supra.*

Under a far more rational interpretation, the phrase "a significant history" means a prior criminal record of a sufficient number of violent felonies to establish the defendant's predilection for crimes of violence. Multiple felony convictions may be highly relevant in evaluating the defendant's character; a single incident[4] is not. In the instant case the jury was presented with evidence of a single prior criminal episode which resulted in a single prison sentence. I would hold that such a fact is insufficient as a matter of law to support the finding of the only aggravating circumstance even arguably returned by the jury in this case. *See Commonwealth v. Goins*, 508 Pa. 270, 495 A.2d 527 (1985). *But see Commonwealth v. Cross*, 508 Pa. 322, 496 A.2d 1144 (1985).

Since the sentencing decision in the instant case was egregiously improper, I would vacate the death sentence and impose a sentence of life imprisonment.

LARSEN, Justice, concurring and dissenting.

I concur in the result reached by that portion of the opinion announcing the judgment of the Court upholding appellant's convictions. However, I dissent to the affirmance of the death penalty and I would vacate that sentence and remand the case for imposition of a sentence of life imprisonment.

At the sentencing hearing, the Commonwealth attempted to establish the existence of two aggravating circumstances contained in the Sentencing Code, namely that the "defendant committed a killing while in the perpetration of a felony" and that the "defendant has a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa.C.S.A. § 9711(d)(6) and (d)(9), respectively. Appellant offered evidence, by his own testimony,

---

**4.** While what is said on the Senate floor may not be relied upon in ascertaining legislative intent, *see Commonwealth v. Alcoa Properties, Inc.*, 440 Pa. 42, 269 A.2d 748 (1970), it is interesting to note that members of the Senate, in discussing section (d)(9) prior to the enactment of the death penalty statute, spoke in terms of "five" and "ten" prior convictions. 1978 Pa.Legis.J.—Senate 88.

under the "general" category of mitigating circumstances of subsection (e)(8) of the Code, which provides that mitigating circumstances include "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S.A. § 9711(e)(8). Such "other evidence" offered to the jury included appellant's military service and tour of duty in Korea, his employment history, his father's death when he was three years old, his problems with alcohol, and that he had three children, the youngest of which was fifteen months old.

Following closing arguments and instructions by the court, the jury returned a sentence of death based upon its finding of "one or more aggravating circumstances which outweigh any mitigating circumstances." The jury had been instructed by the court, in accordance with the Sentencing Code, to list on a verdict slip the aggravating circumstances it found to have been proven beyond a reasonable doubt by the Commonwealth. 42 Pa.C.S.A. § 9711(f). On the verdict slip provided by the court, the jury recorded the "aggravating circumstances" it found as "willfully taking the life of another," "repeated offenses," and "failure of rehabilitation."

Our death penalty sentencing procedures, unlike those of some other states, strictly limit the "aggravating circumstances" that may be presented by the Commonwealth and considered by the jury or judge to the ten enumerated circumstances set forth in subsection (d), 42 Pa.C.S.A. § 9711(d) ("Aggravating circumstances *shall be limited to* the following...."). *See also* 42 Pa.C.S.A. § 9711(a)(2) and (c)(1)(i). Those ten aggravating circumstances established by the legislature are, therefore, the *exclusive* bases upon which a jury or judge may predicate a sentence of death.

It is clear that at least two of the three "aggravating circumstances" found by the jury in this case are *not* among those exclusive statutory circumstances. "Willfully taking the life of another" is, obviously, a circumstance which is present in *any* case of murder of the first degree

and cannot provide a legitimate basis upon which a jury could return a sentence of death. Neither is "failure of rehabilitation" one of the statutory aggravating circumstances. While "failure of rehabilitation" could conceivably be an unarticulated concern addressed by the legislature in subsection (d)(9) (significant history of felony convictions involving violence), it would be improper for this Court to speculate as to such unarticulated intent or to guess at what the jury might have meant by this finding.[1]

Moreover, none of the jury's "aggravating circumstances" bear even a remote resemblance to the statutory circumstance of subsection (d)(6) which the Commonwealth attempted to demonstrate—thus, we must conclude that the Commonwealth failed to present (to the satisfaction of the jury) sufficient evidence that appellant committed a killing while in the perpetration of a felony. Therefore, only "repeated offenses" can *arguably* be viewed as a jury finding of one of the statutory aggravating circumstances, *if* we accept Mr. Justice Hutchinson's premise that "repeated offenses" is laymen's terminology for "significant history of felony convictions involving ... violence." That premise is certainly plausible, perhaps even likely. However, even accepting the validity of the premise, the sentence of death should not be allowed to stand.

Initially, it is quite apparent that the jury improperly considered non-statutory circumstances as aggravating factors warranting the imposition of the death penalty. The jury's obvious confusion in finding "willfully taking the life of another" and "failure of rehabilitation" as "aggravating circumstances" probably resulted from the court's less than clear instructions. The court did instruct the jury that aggravating circumstances are defined by statute [2] and

---

1. The opinion announcing the judgment of the Court concludes that the "aggravating circumstances" found by the jury were "proper aggravating circumstances, although express[ed] in laymen's terms...." At 849, n. 16. There is no reason given to support this conclusion.

2. The court actually told the jury that "the Pennsylvania Crimes Code defines aggravating circumstances." However, it is not the Pennsylva-

that the Commonwealth had presented evidence of the two aggravating circumstances previously mentioned, (d)(6) and (d)(9). However, the court did not specifically instruct the jury that *only* those circumstances enumerated by statute and presented by the Commonwealth could be considered to be "aggravating circumstances" warranting the death penalty. To the contrary, the court's instruction was liberally laced with language from which the jury could, and did, infer that it was not limited by the statute in its selection of "aggravating circumstances," [3] as evidenced by the jury's findings which have no counter-parts in subsection (d).

Thus despite Mr. Justice Hutchinson's unreasoned assertion to the contrary (*see* note 1, *supra* ), this case most certainly *does* present a situation where the jury predicated

---

nia Crimes Code that defines aggravating circumstances, but the Sentencing Code, 42 Pa.C.S.A. §§ 9701, 9711.

**3.** The court's instructions contained the following language:

> *You will have to evaluate that evidence in your own mind and determine how aggravating you consider them to be.* You are also entitled to take into consideration all of the testimony that was presented at the trial of this case which concluded yesterday with the return of your verdict. *And you must weigh that testimony and determine in your own mind* whether the Commonwealth has established those aggravating circumstances beyond a reasonable doubt.
>
> \* \* \* \* \* \*
>
> Now, you must weigh all of the aggravating circumstances that *you consider proven to you* beyond a reasonable doubt. And you must weigh all of the mitigating circumstances which you feel have been proven to you by the fair weight and preponderance of the evidence. You must also consider the evidence that you heard and accepted as fact during the trial of this case in chief, as we call it, during the trial of Charles Holcomb in connection with the offenses lodged against him which you returned verdicts on yesterday. You are not, and I emphasize this, you are not to decide the sentence to be imposed on this Defendant out of any feeling of vengeance or prejudice. *You must decide this sentence solely on the basis of what you feel to be the aggravating circumstances that are proven to your satisfaction,* and the mitigating circumstances that have been established to your satisfaction. In doing so, *you must remember that you, the Jury in this instance, are not recommending punishment. Yours is the power of decision. You, and you alone, not the lawyers, not the Court, not the media, you and you alone must decide* whether the Defendant shall receive a sentence of life imprisonment or a sentence of death.

N.T. at 27–30. (Emphasis added).

its sentence of death on improper aggravating circumstances. We are squarely confronted, therefore, with the question of whether, and under what circumstances, a sentence of death must be vacated where the sentence is predicated upon both proper and improper aggravating circumstances and upon a finding that the aggravating circumstances outweigh the mitigating circumstances. For the reasons which follow, I would hold that such a sentence of death must be vacated unless there is no reasonable possibility that the consideration of the improper aggravating circumstances could have affected the balancing process or produced the sentence of death, *i.e.* unless this Court finds that the erroneous consideration of improper aggravating circumstances was harmless beyond a reasonable doubt.[4]

In the situation wherein the jury or judge has found both proper and improper aggravating circumstances and no mitigating circumstances, it is clear this Court need not necessarily vacate a sentence of death. As this Court quite recently stated in *Commonwealth v. Morales*, 508 Pa. 51, 494 A.2d 367 (1985):

> We note, however, that [vacating a sentence of death] might not be required, for instance, where the jury has found (and the record supports) the existence of several aggravating circumstances and no mitigating circumstances. Since the jury is required to return a sentence of death where it finds "at least one aggravating circumstance ... and no mitigating circumstance," 42 Pa.C.S.A.

**4.** The opinion announcing the judgment of the Court states "[t]his is not a situation where the jury heard evidence on or found an improper aggravating circumstance." At 456, n. 16. Despite this statement, there follows lengthy discussion of "what if" such a situation were presented, and that, in such a situation, "we would be required to vacate the death sentence" because "there can be no meaningful appellate review of the weighing process ... to determine whether the jury's consideration of the improper circumstance was harmless error beyond a reasonable doubt." *Id.* at 456, n. 16 and 459. If it is correct that the "situation" is not presented here, then the discussion of the consequences of that "situation" in section VIII B must be regarded as dictum. As we have seen in text, however, the assessment of the "situation" as not presented here is erroneous, as is the "dictum" regarding the consequences of that "situation."

§ 9711(c)(iv), the sentence of death would, it seems, retain its integrity even though one of the several aggravating circumstances is later declared to be invalid for some reason. *See, e.g., Commonwealth v. Beasley,* [504] Pa. [485], [500 n. 3], 475 A.2d 730, 738, n. 3 (1984) ("The presence of, and correctness of, a jury's finding of a second aggravating circumstance is not relevant in a case such as this where there have been found no mitigating circumstances, since one aggravating circumstance alone requires a verdict of death."); *Zant v. Stephens,* [462] U.S. [862], 103 S.Ct. 2733 [77 L.Ed.2d 235] (1983) (death sentence imposed by jury supported by at least one valid aggravating circumstance need not be set aside merely because another aggravating circumstance found by jury was ultimately declared unconstitutional by state supreme court; circumstances discussed where death penalty would be vacated); *Barclay v. Florida,* [463] U.S. [939], 103 S.Ct. 3418 [77 L.Ed.2d 1134] (1983) (consideration by sentencing trial judge of an aggravating circumstance declared invalid under state law did not so infect process of weighing aggravating circumstances against mitigating as to require death penalty be vacated).

*Id.,* 508 Pa. at 69, 494 A.2d at 376–77.[5]

Where the sentence of death is based upon a finding of "one or more aggravating circumstances which outweigh any mitigating circumstances," however, and one or more of the aggravating circumstances are later declared improp-

**5.** I note the possibility that, even where no mitigating circumstances have been found, vacating the sentence of death *might* be required in appropriate circumstances. For example, in *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the United States Supreme Court noted that the "Florida Supreme Court has not always found that consideration of improper aggravating factors is harmless, even when no mitigating circumstances exist." *Id.* at 3427. In *Lewis v. State,* 398 So.2d 432 (Fla.1981), the trial judge who sentenced Lewis to death had found four aggravating circumstances and no mitigating. On appeal, the Florida Supreme Court found that the evidence failed to support three of the aggravating circumstances and, with only one "relatively weak aggravating circumstance left standing, the Florida Supreme Court did not find harmless error, but rather remanded for resentencing." 103 S.Ct. at 3427.

er or not supported by sufficient evidence, the situation presents a more difficult task for this Court. While more difficult, it is certainly *not* "impossible to tell from the record how the jury would have decided absent the improperly presented circumstances." Slip opinion announcing judgment of the Court at 41. Mindful that the death penalty is qualitatively unique in its severity and finality and requires the most careful appellate scrutiny by this Court, I nevertheless believe there is room for harmless error analysis in these situations.

Appellate courts are frequently called upon to determine what effect, if any, a trial court's errors may have had upon a jury's finding of guilt. Since the jury rarely, if ever, makes specific findings as to what evidence or arguments it found persuasive, the reviewing court is always handicapped to some extent when it examines the effect of trial error. Yet this handicap does not preclude a harmless error analysis, it merely renders the task more difficult. As this Court stated in *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978):

> The harmless error rule derives from the notion that although an accused is entitled to a fair trial, he is not entitled to a perfect one.... The harmless error rule can save the time, effort and expense of unnecessary retrials where the defendant has not been prejudiced by an error.... But courts must be careful in applying the harmless error rule, for if the violation of a rule is too readily held harmless, the importance and effectiveness of the rule is denigrated. We believe that the "beyond a reasonable doubt" standard reaches the most reasonable balance between the consideration of judicial economy and the important policies which underlie constitutional and non-constitutional rules.
>
> ... We adopt the standard that an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a " 'reasonable possibility' " that an error " 'might have contributed to the conviction,' " the error is

not harmless. *Commonwealth v. Davis*, 452 Pa. [171] at 178, 305 A.2d [715] at 719, quoting *Chapman v. California*, 386 U.S. [18] at 24, 87 S.Ct. [824] at 828 [17 L.Ed.2d 705 (1967)].

In numerous cases, this Court has focused solely on the prejudicial impact of the erroneously admitted evidence, considering other, properly admitted evidence only in relation to this inquiry. When the record reveals that an error did not prejudice the defendant, or that the prejudice was so minimal that, beyond a reasonable doubt, it did not influence the jury, we have held the error harmless. In other cases, we have reversed because the prejudice was more than *de minimis*.

This Court has also examined the properly admitted evidence to determine whether the erroneously admitted evidence was merely cumulative of other, untainted evidence. An error which, viewed by itself, is not minimal, may nonetheless be harmless if properly admitted evidence is substantially similar to the erroneously admitted evidence.

*Id.*, 476 Pa. at 408–12, 383 A.2d at 164–165 (footnotes and citation omitted).

There is no reason why such an analysis may not be applied to review of a sentence of death where the sentencer has relied upon both proper and improper aggravating circumstances and has balanced those circumstances against mitigating to arrive at a verdict of death. For purposes of this opinion, I will not engage in protracted discussion of *Zant v. Stephens, supra,* and *Barclay v. Florida, supra,* but I believe it legitimate to conclude that these cases support a harmless error analysis in this balancing of circumstances context. In *Zant,* the United States Supreme Court left open the question stating:

Finally, we note that in deciding this case we do not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is "invalid" under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggra-

vating and mitigating circumstances in exercising its discretion whether to impose the death penalty.

103 S.Ct. at 2750. Nevertheless, much of the reasoning of *Zant* and of *Barclay* supports the application of a harmless error analysis where the jury has considered proper and improper aggravating circumstances and has weighted those circumstances against mitigating. In *Barclay*, that Court stated:

> The crux of the issue, then, is whether the [sentencer's] consideration of this improper aggravating circumstance *so infects the balancing process* created by the Florida statute that it is constitutionally impermissible for the Florida Supreme Court [to] let the sentence stand.

In holding that the trial court's consideration of an improper non-statutory aggravating circumstance along with proper aggravating circumstances was harmless error, the plurality in *Barclay* stated:

> [T]he Florida Supreme Court does not apply its harmless error analysis in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this analysis only when it actually finds that the error is harmless. *There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance.* See n. 9, *supra*. "What is important ... is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant, supra*, U.S., at [879], 103 S.Ct., at 2743–2744 (emphasis in original).

103 S.Ct. at 3428.[6]

So too under our Sentencing Code, there is no reason why this Court cannot examine the balance struck by the jury or

---

6. The Florida statute is similar to the Pennsylvania statute in that Florida law "requires the sentencer to balance statutory aggravating circumstances against all mitigating circumstances and does not permit non-statutory aggravating circumstances to enter into this weighing process.... The statute does not establish any special standard

judge and decide that the consideration of improper aggravating circumstances could not possibly have affected the balance or have produced the sentence of death. 42 Pa.C.S.A. § 9711(h)(3)(i).[7] While the jury is not required to list mitigating circumstances it found, this Court may easily search the record to determine any and all mitigating circumstances presented to the jury. From all the foregoing, I would hold that it is appropriate to apply a harless error analysis where the sentencer has found both proper and improper aggravating circumstances which outweigh mitigating, and to uphold the validity of a sentence of death so imposed where this Court determines, beyond a reasonable doubt, that elimination of the improper aggravating circumstances could not possibly have affected the balance or produced the sentence of death.

In the instant case, however, the error in considering improper aggravating factors cannot be found to be harmless beyond a reasonable doubt. The jury found only one circumstance, "repeated offenses", which might *possibly* qualify as a statutory aggravating circumstance ((d)(9)). "Repeated offenses" is not the "strongest" of the ten enumerated circumstances of subsection (d). On the other hand, although the mitigating circumstances presented to the jury were not the most significant of those set forth in subsection (e), neither can we say they were *de minimis*. Since consideration of the improper "aggravating circumstances" may well have affected the jury's balance in this

for this weighing process." *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. at 3426.

7. *See Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* — U.S. —, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). In *Frey,* we held that while the trial court's instruction to the jury was technically erroneous, this Court would vacate a sentence of death *only* where the error injects "passion, prejudice or some other arbitrary factor" into the deliberative process which factor produces the sentence of death. 504 Pa. at 436, 475 A.2d at 704. Relying on the standard of review established by the Sentencing Code, 42 Pa.C.S.A. § 9711(h), and upon *Barclay* and *Zant,* we stated "it is clear that the lower court's technical deviation from the exact language of the Sentencing Code ... did not impermissibly infect the balancing process nor did it inject an arbitrary factor, passion or prejudice into the deliberations." 504 Pa. at 439–40, 475 A.2d at 705–06.

case, I would vacate the sentence of death and remand to the court of common pleas for imposition of a life sentence. 42 Pa.C.S.A. § 9711(h)(2).

The opinion announcing the judgment of the Court attempts to buttress its affirmance of the sentence of death with its finding that on "this record ... this case presents the type of murder the Legislature intended to cover by [the] aggravating circumstance" set forth in subsection (d)(6), "killing while in the perpetration of a felony". Although the Commonwealth attempted to demonstrate the existence of this aggravating circumstance, the jury made *no such finding*. It is *manifestly improper*, therefore, for this Court to examine the record and make its own contradictory finding. It is also improper to address appellant's contention that this aggravating circumstance is overbroad and facially defective. Since the jury did not predicate its verdict on this circumstance and since appellant was not, therefore, prejudiced by the Commonwealth's legitimate attempts to prove its existence, appellant has no standing to challenge its validity. *See Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309, 1318 (1984).

I must also voice my disagreement with Mr. Justice Hutchinson's strained interpretation of subsection (d)(9). First, I disagree that "the legislative definition of this particular aggravating circumstance requires *more than one prior* conviction", at 851. for the reasons set forth in my dissenting opinion in *Commonwealth v. Goins*, 508 Pa. 270, 495 A.2d 527 (1985). In that case, I stated my view that "for purposes of subsection (d)(9), the jury (or judge) may consider the defendant's contemporaneous conviction for murder of the first degree as part of his or her 'significant history of felony convictions involving the use or threat of violence,' " *id.* at 538, a view that Mr. Justice Hutchinson apparently supports. *See* at 462, n. 20. ("This less restrictive definition of conviction arguably could allow the kidnapping and rape in this case to constitute part of the significant history of felony convictions.")

Moreover, I find indefensible and implausible the notion that the Legislature intended the applicability of subsection (d)(9) to be dependent upon the degree of similarity between the prior and current crimes, *i.e.* where the prior crimes had a "high degree of correlation" to the current crimes for which the defendant has just been found guilty. At 461–463. Under this interpretation, a jury is presumably to consider whether there was "a connecting thread between the nature of the crimes." *Id.* This interpretation is premised on the unfounded assumption that "the term 'significant' ... relates to the qualitative relationship between the prior conviction and the present homicide prosecution." *Id.* at 460–461.

The opinion announcing the judgment of the Court offers two examples as "guidelines":

> For example, two prior convictions, one for robbery and one for an accompanying aggravated assault, satisfy the legal test of quantity but are not necessarily factually significant in relation to a murder committed during a family quarrel. Likewise, a history of rape and indecent assault would be a less "significant history" for sentencing on a murder committed during a robbery than on one committed during a rape or sexually motivated aggravated assault.

*Id.* at 461.

There is not the *slightest* indication that the Legislature intended such a result. Any "connecting thread" established by the Legislature in subsection (d)(9) is plain—that "connecting thread" is the "thread" between "felony convictions involving the use or threat of violence to the person", *not* between "felony convictions of a similar factual nature to the current crimes." Mr. Justice Hutchinson's interpretation, and the result of that interpretation illustrated by the above examples, violates the common sense and cardinal principle of statutory construction that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." The Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1922(1). This interpretation is both "absurd" and "unreasonable" and it provides a wind-

fall to the creative criminal who has varied his *modus operandi*.

In my opinion, this Court should leave well enough alone. "Significant history of felony convictions involving the use or threat of violence to the person" is plain and unambiguous and is just *not* that difficult of a concept. It should be left to the jury to determine whether such "significant history" applies in a given case.[8] I have every confidence that the common sense and practical meaning given to this aggravating circumstance by a jury (or trial judge) will prove infinitely more workable and less vague than some contrived definition directing the sentencer to consider such items as "numerosity" and "factual significance," "connecting threads," "qualitative relationships," "propensities towards *particular types* of violent aggression" and "degrees of correlation." At 459–466. Far from "avoiding constitutional infirmity," *id.* at 463–465, Mr. Justice Hutchinson's interpretation creates a host of problems, constitutional and otherwise, for this aggravating circumstance.

There is also a more direct and desirable method of "avoiding constitutional infirmity." This Court is required to review each sentence of death to determine whether it is "excessive or disproportionate to the penalty imposed in similar cases." 42 Pa.C.S.A. § 9711(h)(3)(iii). To that end, we have directed the Administrative Office of Pennsylvania Courts to compile and monitor an on-going, comprehensive death penalty study dealing with all aspects of cases of murder of the first degree. *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, 707–08 (1984), *cert. denied* —— U.S. ——, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). This study greatly facilitates our obligation to ensure that the death penalty sentencing procedures achieve their purpose of limiting and channeling the discretion of the sentencer so as to minimize the risk of arbitrary and capricious sentencing.

---

**8.** In *Commonwealth v. Szuchon*, 506 Pa. 228, 238 n. 4, 484 A.2d 1365, 1370, n. 4 (1984), this Court stated:

> It was placed on the record that appellant entered a plea of guilty to a charge of robbery in 1974. The court, correctly, left it to the jury to determine whether or not this constituted a 'significant history of prior criminal convictions' [under mitigating circumstance (e)(1) ].

*Zant v. Stephens, supra* at 103 S.Ct. 2741. Should our review disclose arbitrary and capricious results in cases dealing with the aggravating circumstance of subsection (d)(9), this Court could then determine whether "significant history of felony convictions involving ... violence to the person" is constitutionally infirm. Until then, "if it's not broke, don't fix it."

Finally, the opinion announcing the judgment of the Court demonstrates the danger inherent in attempting to cover too much territory. The opinion is advisory in many respects as it dwells at length upon non-issues or tangential issues.[9] The advisory nature of the opinion distracts from

**9.** Examples include: (1) The protracted discussion (seven pages) of the interpretation of subsection (d)(9) as requiring either sufficient "numerosity" or a high degree of factual correlation between the nature of the defendant's prior and current crimes in order to "protect[ ] the statute from unconstitutional vagueness." At 464. This "protection" is unnecessary, however, because this Court has *already rejected* a vagueness challenge to the quite similar subsection (e)(1), "significant history of prior criminal convictions," noting:

> In reviewing an identical claim of vagueness asserted against the corresponding portion of the death penalty statute of the State of Florida, which employed virtually identical language, the Supreme Court of the United States rejected the vagueness claim, noting that *a jury's evaluation of the aggravating and mitigating circumstances, as enumerated, requires no more line drawing than is commonly required of a factfinder in any lawsuit. Proffitt v. Florida,* 428 U.S. 242, 257, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913, 925–926 (1976). We agree.

*Commonwealth v. Beasley,* 504 Pa. 485, 475 A.2d 730, 737 (1984) (emphasis added); (2) The largely unnecessary discussion (seven pages) of the standard for determining when a person is in custody for *Miranda* purposes. The step-by-step run through of the law from *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) to the present is not appropriate here. Any lingering notion that the *Escobedo*—"focus of the investigation" test provides an independent basis for triggering *Miranda* could be easily dispatched by rejecting said notion and citing to the many recent cases which similarly reject that notion and reiterate this Court's frequently repeated test for determining when a suspect is in "custody." *See, e.g. Commonwealth v. Zeigler,* 503 Pa. 555, 470 A.2d 56 (1983); *Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311 (1983); *Commonwealth v. McLaughlin,* 475 Pa. 97, 379 A.2d 1056 (1977); *Commonwealth v. Anderson,* 253 Pa.Super. 334, 385 A.2d 365 (1978) (recognizing that *McLaughlin* had overruled the *Escobedo*—focus test as an independent basis for the necessity of *Miranda* warnings); (3) The dictum (four pages) regard-

the major problem posed by the case which the majority of this Court has failed to address, namely the consequences of the jury's consideration of improper aggravating circumstances. (*See* note 4, *supra* ).

ZAPPALA, Justice, dissenting.

I must respectfully dissent.

I cannot accept the plurality's conclusion that Appellant was not entitled to a change of venue. While the plurality recognizes that the publicity here was so pervasive that it may have been inherently prejudicial to the Appellant, it then concludes that the publicity was "sufficiently dissipated before the time of trial to allow the defendant to receive a fair trial." (Opinion Announcing the Judgment of the Court, pages 444–446).

To this point I must reiterate my belief that where publicity is found to be inherently prejudicial, it is "irrelevant to attempt to then separate that prejudice from thos who may or may not have been affected by it." *Commonwealth v. Romeri*, 504 Pa. 124, 140, 470 A.2d 498, 506 (1983), (Zappala, J. Dissenting). On the basis of that dissent, I would hold that in this instance, where the pre-trial publicity is so pervasive as to be deemed inherently prejudicial, a change of venue must be granted without further inquiry.

I also disagree with the plurality's "focus of the investigation" discussion relative to the admissibility of Appellant's pre-arrest statements. It is clear from the findings of the Suppression Court that Appellant was merely a suspect, not the focus of the investigation, when he was first questioned. When he became the focus of the investi-

ing the interpretation of subsection (d)(6), as I have discussed in text, *infra;* and (4) The discussion (four pages) of the effect upon a sentence of death where the sentencer relied in part upon improper aggravating circumstances, despite the belief expressed in the opinion announcing the judgment of the Court that the situation was not presented in this case, (*see* note 4, *supra* ).

gation, *Miranda* warnings were immediately given to him. As such, he was in custody and the admissibility of his statements need only be examined as the product of custodial interrogation; the focus "analysis" is unnecessary and therefore merely dictum.[1]

1. Because I find the plurality's "focus" discussion dictum, I will save for another day a prolonged analysis of my belief that at least under the Pennsylvania Constitution, once a suspect becomes the focus of an investigation, he is to be advised of his constitutional rights to remain silent and to consult with counsel prior to making any statement.